UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| J. G., BY AND THROUGH HIS PARENTS, HOWARD AND DENISE GREENBERG, HOWARD GREENBERG, and DENISE GREENBERG,<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF HAWAII, DEPARTMENT OF EDUCATION, DENISE GUERIN, PERSONALLY AND IN HER CAPACITY AS DISTRICT EDUCATION SPECIALIST, and FRANCOISE WHITTENBURG, PERSONALLY AND IN HER CAPACITY AS PRINCIPAL OF LOKELANI INTERMEDIATE SCHOOL,<br><br>Defendants. | CIV. NO. 17-00503 DKW-KSC<br><br><br>**ORDER AFFIRMING THE DECEMBER 20, 2017 DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER** |

This appeal concerns the administrative hearings officer's ("AHO")

determination of J.G. ("Student") and Howard and Denise G.'s ("Parents") request

for due process following the issuance of Student's March 16, 2017 Individualized

Education Program ("IEP") for the 2017–18 school year. Because Parents have

not shown by a preponderance of the evidence that the AHO's December 20, 2017

decision (Dkt. No. 97-29) should be reversed, the Court AFFIRMS that decision.

# BACKGROUND

Student, who was fourteen years old at the time of the AHO's December 20, 2017 decision ("Decision"), is eligible for special education and related services pursuant to the Individuals with Disabilities Education Act of 2004 ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*, for Autism Spectrum Disorder ("ASD"), Level 3 (requiring very substantial support) with early language impairment, Anxiety Disorder, and Obsessive-Compulsive Disorder. Decision at 5 (FOF 2), Dkt. No. 97-29 (citing Pet'rs' Admin. Ex. 4 [Confidential BACB Advisory Warning (Sept. 2, 2015)] at 121–22, Dkt. No. 103-5). Student has received these services via Autism Management Services a/k/a Maui Autism Center ("AMS"), a private school owned by Parents, since 2010. Second Am. Compl. ("SAC") ¶ 11, Dkt. No. 72; *see also* Decision at 5 (FOF 6), Dkt. No. 97-29 (citations omitted).

Student's IEP for the 2017–18 school year was developed during a series of IEP meetings on February 22, February 24, March 13, March 15, and March 16, 2017.[1] At least eight individuals—including Parents, Defendant Françoise Wittenburg (Principal of Student's "Home" School, Lokelani Intermediate

---

[1] IEPs are crafted annually by a group of individuals (the "IEP team") composed of "the parents of a child with a disability," at least one regular education teacher and one special education teacher, a qualified and knowledgeable representative of the local educational agency, "an individual who can interpret the instructional implications of evaluation results," if not one of the other IEP team members, "other individuals who have knowledge or special expertise regarding the child," at the discretion of the parent or agency, and "whenever appropriate, the child with a disability." 20 U.S.C. § 1414(d)(1)(B).

School),[2] three Department of Education ("DOE") teachers including Julia Whiteley (then-Special Education Teacher at the Home School and DOE Department Head), an Occupational Therapist, and a Speech-Language Pathologist—attended each IEP meeting.  *See* Pet'rs' Admin. Ex. 8 [Mar. 16, 2017 IEP] at 29–34, Dkt. No. 103–9.[3]

The resulting March 16, 2017 IEP provides Student with special education services—including one-to-one individual instructional support and "specifically designed instruction in the areas of reading, writing, mathematics, behavior, functional performance, and communication"—occupational therapy, speech and language therapy, transportation, and a variety of other supplementary aids and services, program modifications, and supports.  March 16, 2017 IEP at 2 (¶ 10), 26–27 (¶ 21).  On the day of the final IEP meeting, Principal Wittenburg led the IEP team in a discussion of options along the LRE continuum, from least-to-most restrictive (*see, e.g.*, Decision at 11–15 (FOFs 58–64), Dkt. No. 97-29 (citations omitted)), until they determined that the IEP could be implemented at DOE's new public separate facility (Pet'rs' Admin. Ex. 10 [Mar. 17, 2017 Prior Written Notice of Dep't Action ("PWN")] ¶ 3, Dkt. No. 103-11 at 4).  Accordingly, Principal

---

[2]The Court adopts the Defendants' spelling of Principal Wittenburg's name, which is apparently misspelled in the case caption.  *See* Defs.' Ans. to SAC at 2 n.1, Dkt. No. 94.

[3]An AMS-affiliated Board Certified Behavioral Analyst ("BCBA"), Keola Awana, also attended the final IEP meeting on March 16, 2017.  *See* Mar. 16, 2017 IEP at 34, Dkt. No. 103–9.

Wittenburg "[r]ejected placement at a private separate facility" such as AMS in favor of placement at the less restrictive public separate facility, Poʻokela Maui specialized education center.  Mar. 17, 2017 PWN ¶ 3, Dkt. No. 103-11 at 4.[4]  At Poʻokela Maui, Student would "participate with disabled peers during all school hours" and would "have opportunities to interact with non-disable[d] peers during community outings."  Mar. 16, 2017 IEP at 28 (¶ 23), Dkt. No. 103-9.

Because Student "receive[d] educational services in a private setting, [AMS] located in Kihei, HI," when the March 16, 2017 IEP was developed, the IEP also provides for the following "transition plan" "[t]o occur prior to and during change of placement":

> Because student had been in private separate facility for some time, a transition plan will be implemented to mitigate any potential harmful impact of him moving to a less restrictive environment and transitioning to a new school.  Factors to consider for transition will include new people, new location, self-injurious behaviors, potential regression, access to the community, [and] new program routines.

March 16, 2017 IEP at 2 (¶ 10), 27 (¶ 21), Dkt. No. 103-9.

The instant matter arises out of Parents' May 5, 2017 amended request for due process, which challenges the DOE's "unilateral decision to change [Student]'s [educational] placement" from AMS to Poʻokela Maui in the

---

[4]The March 16, 2017 IEP meeting did not end immediately after the public separate facility recommendation was made.  Because Parents strongly objected, the team engaged in further discussion about why Poʻokela Maui would be a less restrictive environment than AMS, as discussed in further detail below.

March 16, 2017 IEP.  Admin. R., Ex. 1 [Pet'rs Addendum to Am. Request for

Impartial Due Process Hr'g] at 2, 5, Dkt. No. 97-1 [hereinafter Due Process

Compl.].  Parents contend that the March 16, 2017 IEP denied Student a free

appropriate public education ("FAPE"), as required by the IDEA, 20 U.S.C.

§ 141(9)(d)(1)(A), because: the change in placement was "predetermined in the

IEP without input from [Parents]"; Parents "knew nothing about the Poʻokela Maui

facility and the DOE provided no information regarding the facility" prior to

changing Student's placement in the IEP; "independent research by . . . [P]arents

indicated that the Poʻokela Maui facility was inadequate to meet [Student's] needs

and would not provide him a FAPE"; "the change in [Student's] educational

placement from AMS, where he had been for at least 7 years, to Poʻokela Maui

violated the IDEA and . . . [P]arents['] procedural safeguards" under it; and

"keeping [Student] in his current placement was not even considered by the IEP

team."  Due Process Compl. at 3–4, Dkt. No. 97-2.[5]  A hearing on this Due Process

---

[5]Parents also suggest that the timing of the recommended change of Student's placement—which "followed closely on the heels of a Ninth Circuit determination" in Student's related cases, *G. et al. v. State of Hawaii, Department of Education, et al.*, Case No. 1:11-cv-00523-DKW-KSC (D. Haw. Aug. 25, 2011), and *Department of Education, State of Hawaii v. G.*, Case No. 1:13-cv-00029-DKW-KSC (D. Haw. Jan. 17, 2013) (consolidated), that was "highly favorable to [Parents] with respect to [Student]'s placement at AMS"—"represents unlawful retaliation by the DOE against [Parents] for their prior efforts to enforce [Student]'s right to a FAPE and for their advocacy on behalf of others in the Maui special education community."  Due Process Compl. at 12, Dkt. No. 97-2.

Complaint was scheduled for October 30, 2017 before AHO Rowena A.

Somerville.

In anticipation of their due process hearing, Parents filed an August 9, 2017

Motion to Establish Burden of Proof, asking the Office of Administrative Hearings

to "assign the burden of proof to []DOE as to whether the change in [Student]'s

placement from the judicially-approved placement at AMS back to the public

school Poʻokela Maui complies with IDEA and is a proper change of placement."

Admin. R., Ex. 11 [Burden of Proof Mot.] at 16, Dkt. No. 97-12. AHO Somerville

denied the Burden of Proof Mot. on October 11, 2017. *See* Admin. R., Ex. 19

[Order Denying Burden of Proof Mot.], Dkt. No. 97-20. In a letter dated

September 27, 2017, Parents also requested that AHO Somerville conduct a site

visit of AMS prior to ruling on the Due Process Complaint (Admin. R., Ex. 16

[Site Visit Request], Dkt. No. 97-17), but AHO Somerville declined to do so on

September 29, 2017 (Admin. R., Ex. 18 [Order Denying Site Visit Request], Dkt.

No. 97-19).

On October 10, 2017, Parents initiated the instant federal lawsuit

challenging the Order Denying Burden of Proof Motion and the Order Denying

Site Visit Request (collectively "AHO Somerville's Pre-Trial Orders"). Compl.,

Dkt. No. 1. The same day, Parents also filed a motion before the AHO (Dkt. No.

10-3 at 103–08) seeking to stay further administrative proceedings on the Due

Process Complaint "pending resolution of issues on appeal." Parents next filed a "Motion to Enforce the 'Stay Put' Rule" in this Court on October 11, 2017, in which they requested an order requiring the DOE "to allow [Student] to remain in and continue to pay for his current educational placement at [AMS] until complete resolution of the issues presently before this Court, including any appeals taken therefrom." *See* Mot. to Enforce at 4, Dkt. No. 7. Parents filed their First Amended Complaint (Dkt. No. 9) and a Motion for TRO (Dkt. No. 10) on October 19, 2017. In the latter, Parents sought review of AHO Somerville's Pre-Trial Orders and asked the Court to enjoin administrative proceedings on the Due Process Complaint scheduled for October 30, 2017. *See* TRO Mot. ¶ 6, Dkt. No. 10. Finding both of AHO Somerville's Pre-Trial Orders to be "clearly interlocutory," this Court denied the Motion for TRO on October 25, 2017. Entering Order (Oct. 25, 2017), Dkt. No. 37 (citing *In re Merle's Inc.*, 481 F.2d 1016, 1018 (9th Cir. 1973)). Parents appealed the October 25, 2017 Entering Order to the Ninth Circuit Court of Appeals on October 26, 2017. *See* Notice of Interlocutory Appeal, Case No. 17-17190 (9th Cir. Oct. 25, 2017), Dkt. No. 38.[6] This Court denied Parents' October 26, 2017 "Motion to Stay Proceedings Pending [Interlocutory] Appeal" (Dkt. No. 39). *See* Entering Order (Oct. 26, 2017), Dkt.

---

[6]Parents' interlocutory appeal was denied. *See* Mem., Case No. 17-17190 (9th Cir. June 27, 2018), Dkt. No. 132.

No. 40.  After the AHO filed the Decision on December 20, 2017, Parents filed the

SAC on February 22, 2018, raising fifteen causes of action and seeking monetary,

declaratory, and injunctive relief.  SAC, Dkt. No. 72.

The administrative hearing on Parents' May 5, 2017 Due Process Complaint

began on October 30, 2017 and lasted for four days.  *See* Tr. of Proceedings (Oct.

30, 2017), Dkt. No. 99; Tr. of Proceedings (Oct. 31, 2017), Dkt. No. 100; Tr. of

Proceedings (Nov. 1, 2017), Dkt. No. 101; Tr. of Proceedings (Nov. 2, 2017), Dkt.

No. 102.  In her December 20, 2017 decision, AHO Somerville upheld the

placement decision of Poʻokela Maui in Student's March 16, 2017 IEP, concluding

that Parents had "not met their burden and ha[d] not shown procedural or

substantive violations of the IDEA denying Student a FAPE."  Decision at 32, Dkt.

No. 97-29.  In support of this holding, the Decision contains the following

conclusions of law:

> The Hearings Officer finds the DOE witnesses to be credible.
> The Hearings Officer further finds that the DOE did not block
> Parents' participation in the March 16, 2017 IEP meeting or
> predetermine Student's placement.  The Hearings Officer
> further finds that the DOE offered Student a FAPE that was
> appropriately designed to convey student a meaningful
> educational benefit.
>
> . . . .
>
> The IEP was specifically tailored to meet Student's unique
> needs and provide him with a meaningful educational benefit
> and to make progress, and the IEP can be implemented at the
> [public separate facility] with a transition plan.

. . . .

> The private facility [(AMS)] offers Student far less opportunity
> to socialize with non-disabled peers [than] the [public separate
> facility (Poʻokela Maui)].  The Hearings Officer finds that the
> IEP team had an adequate discussion regarding LRE.  The
> Hearings Officer further finds that the [public separate facility],
> with a transition plan, is the LRE for Student.

Decision at 25, 32, Dkt. No. 97-29.  AHO Somerville also found that, because

Parents did not show[] that the March 16, 2017 IEP denied Student a FAPE[,]"

"the issue of appropriateness of the private facility does not need to be addressed."

Decision at 32, Dkt. No. 97-29.

In their Second Amended Complaint (Dkt. No. 72), Parents ask the Court to

vacate AHO Somerville's Pre-Trial Orders ("Counts I & II"; SAC ¶¶ 64–94) and

Decision (SAC ¶¶ 95–190).  In Counts II–IV of the SAC, Parents allege that the

Decision contains errors of law regarding "Burden of Proof," "FAPE Standard,"

"[LRE]/ Placement," "Transition Services," and "Stay Put" ("Count III"; SAC

¶¶ 95–138); mixed errors of law and fact regarding "Parental Participation/

Predetermination," "[LRE]," and "Transition Services" ("Count IV"; SAC ¶¶ 139–

76); and errors of fact that allegedly contributed to the Decision's legal errors

("Count V"; SAC ¶¶ 177–80).  Parents assert that the March 16, 2017 IEP

constitutes a "Denial of FAPE" to Student ("Count VI"; SAC ¶¶ 181–90), among

other things.  The instant dispute relates to Counts I–VI of the SAC.[7]  *See, e.g.*,

Mem. of Law—Pls.' Opening Br. on Cts. 1–6 of SAC, Dkt. No. 123 [hereinafter

OB].

On April 5, 2018, the Court heard oral arguments on the Motion to Enforce

the "Stay Put" Rule (Dkt. No. 7) and other motions in Parents' related cases.[8]  *See*

EP, Dkt. No. 106.  Following this hearing, the parties entered a "Stipulation

Regarding Obligation Under 20 U.S.C. § 1415(j) ('Stay Put') with Respect to

J.G.'s Placement" on April 20, 2018 ("Stay Put Stipulation"), in which they

stipulate and agree that—"J.G.'s stay put placement with respect to the underlying

administrative proceeding, DOE-SY1617-067A, and the current judicial

proceeding . . . is [AMS]"; J.G.'s stay put placement is "based upon" the February

29, 2016 IEP; this placement "shall remain during the pendency of this current

judicial proceeding through and including final resolution of and all appeals of the

IDEA claims"; and the DOE "shall abide by the stay put placement pursuant to the

---

[7]The SAC also brings claims for discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq*. (SAC ¶¶ 191–201) and under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq*. (SAC ¶¶ 202–13); "Civil Rights Violations" arising under 42 U.S.C. § 1983 (SAC ¶¶ 214–46); violations of the "Hawaii Law Against Discrimination in Public Accommodations," Hawai'i Revised Statutes §§ 489-1, *et seq*. (SAC ¶¶ 247–53); violations of the IDEA's "Stay Put" provision, 20 U.S.C. § 1415(j) (SAC ¶¶ 258–64); Intentional Infliction of Emotional Distress (SAC ¶¶ 286–89); and Negligent Infliction of Emotional Distress (SAC ¶¶ 290–91).  The SAC also seeks entry of a declaratory judgment for a "Systemic Violation of IDEA" under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a) (SAC ¶¶ 254–57) and injunctive relief in the form of a TRO allowing Student to remain at AMS and ordering the DOE to reimburse Parents for the associated costs (SAC ¶¶ 265–85).

[8]*Supra* n.4.

IDEA." Stay Put Stipulation at 2, Dkt. No. 118. The parties also filed a stipulation (Dkt. No. 114) dismissing with prejudice all claims against the Office of Administrative Hearings and against AHO Somerville in her capacity as AHO on April 16, 2018.

Parents appeal from the December 20, 2017 Decision that upheld the March 16, 2017 IEP, with the Court hearing oral argument on July 20, 2018. *See* EP, Dkt. No. 138. The instant disposition follows.

## LEGAL STANDARDS

### I. IDEA Overview

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs." *Hoeft ex rel. Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)). It ensures that "all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). As a condition of federal financial assistance under the IDEA, states must provide such an education to disabled children residing in the state who are between the ages of 3 and 21, inclusive. 20 U.S.C. § 1412(a)(1)(A).

Under the IDEA, FAPE means special education and related services that: (a) "have been provided at public expense, under public supervision and direction, and without charge"; (b) "meet the standards of the State educational agency"; (c) "include an appropriate preschool, elementary school, or secondary school education in the State involved"; and (d) "are provided in conformity with the individualized education program . . . ."  20 U.S.C. § 1401(9); 34 C.F.R. § 300.17; Haw. Admin. R. § 8-60-2.  "A FAPE is accomplished through the development of an IEP for each child."  *Laddie C. ex rel. Joshua C. v. Dep't of Educ.*, 2009 WL 855966, *2 (D. Haw. Mar. 27, 2009) (citing *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993), *cert. denied*, 513 U.S. 825 (1994)).

The IDEA guarantees "procedural safeguards with respect to the provision of a [FAPE]" to "children with disabilities and their parents."  20 U.S.C. §§ 1415(a), (b)–(h).  For example, parents of a disabled child who claim violations of the IDEA "with respect to any matter relating to . . . educational placement of the child[] or the provision of a free appropriate public education to such child" can file a complaint with a due process hearing officer under 20 U.S.C. § 1415(b)(6)(A).  *Hopewell Valley Reg'l Bd. of Educ. v. J.R.*, 2016 WL 1761991, *3 (D.N.J. May 3, 2016) (citing *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 257 (3d Cir. 2013)).  Moreover, "wherever a complaint has been received under subsection (b)(6) or (k) of this section, the parents involved in such complaint shall

have an opportunity for an impartial due process hearing" to be "conducted by the State educational agency" at issue—here, the DOE.  20 U.S.C. § 1415(f)(1)(A).

## II.     <u>District Court Review</u>

"Any party aggrieved by the findings and decision" made pursuant to an administrative hearing under the IDEA "shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States . . . ."  20 U.S.C. § 1415(i)(2)(A).  When a party files an action challenging an administrative decision under the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court deems is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see Ojai Unified*, 4 F.3d at 1471.  The party challenging the administrative decision bears the burden of proof.  *See Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007); *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (stating that the challenging party must show, by a preponderance of the evidence, that the decision of the hearings officer should be reversed); *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996).

In reviewing administrative decisions, the district court must give "due weight" to the AHO's judgments of educational policy.  *L.M. v. Capistrano*

*Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2009); *Michael P. v. Dep't of Educ.*, 656 F.3d 1057, 1066 (9th Cir. 2011) (quoting *B.S.*, 82 F.3d at 1499).  However, the district court has the discretion to determine the amount of deference it will accord the administrative ruling itself.  *J.W.*, 626 F.3d at 438 (citing *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).  In reaching this determination, the court should consider the thoroughness of the hearings officer's findings, increasing the degree of deference where said findings are "thorough and careful."  *Michael P.*, 656 F.3d at 1066; *L.M.*, 556 F.3d at 908 (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)); *cf. Cty. of San Diego v. Cal. Special Educ. Hr'gs Office*, 93 F.3d 1458, 1466–67 (9th Cir. 1996) (explaining that the district court should give "substantial weight" to the decision of the hearings officer when the decision "evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented" (citation and quotation marks omitted)).  Further, the amount of deference to be given to an AHO's decision is, in part, influenced by whether the hearings officer's findings are based on credibility determinations of the testifying witnesses.  *See L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 n.4 (3d Cir. 2006); *see also B.S.*, 82 F.3d at 1499 (citations omitted).  Such deference is appropriate because "if the district court tried the case anew, the

work of the hearing officer would not receive 'due weight,' and would be largely wasted." *Wartenberg*, 59 F.3d at 891.

"[T]he ultimate determination of whether an IEP was appropriate," however, "is reviewed de novo." *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 778 (9th Cir. 2010) (citing *Wartenberg*, 59 F.3d at 891).

## DISCUSSION

The Court AFFIRMS the Decision of the AHO, holding that the March 16, 2017 IEP did not deny Student a FAPE.

## I.    FAPE Standard

To provide a free appropriate public education in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP. 20 U.S.C. § 1414(d)(1)(A) ("The term 'individualized education program' or 'IEP' means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title.")). The IEP is to be developed by an "IEP team" composed of, *inter alia*, school officials, parents, teachers and other persons knowledgeable about the child.

To determine whether a student has been offered a FAPE, the Supreme Court of the United States has established a two-part test, which examines:

(1) whether the state has complied with the procedural requirements set forth in the IDEA; and (2) whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982). "Procedural flaws in the IEP process do not always amount to the denial of a FAPE." *L.M.*, 556 F.3d at 909 (citations omitted). Rather, "[a] procedural violation denies a free appropriate public education if it results in the loss of an educational opportunity, seriously infringes the parents' opportunity to participate in the IEP formulation process or causes a deprivation of educational benefits." *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 952 (9th Cir. 2009) (citing *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1208 (9th Cir. 2008)). Additionally, the "educational benefit[]" that the child's IEP "is reasonably calculated to enable the child to receive" must be more than *de minimus*. *Endrew F. v. Douglas County School District*, 137 S. Ct. 988 (2017). The IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. at 1001; *Blake C. ex rel. Tina F. v. Haw. Dep't of Educ.*, 593 F. Supp. 2d 1199, 1206 (D. Haw. 2009) (holding that the IEP must be tailored to the unique needs of the child and reasonably designed to produce benefits that are "significantly more than de minimus, and gauged in relation to the potential of the child at issue").

## II. <u>AHO Somerville's Pre-Trial Orders</u>

AHO Somerville's Pre-Trial Orders denying Parents' Motion to Establish Burden of Proof and Parents' informal Site Visit Request are AFFIRMED.

### A. ***Burden of Proof***

It is firmly established that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). Parents insist that the most significant issue in the instant matter is that AHO Somerville incorrectly imposed this burden on Parents, rather than the DOE. OB at 12–21, 24, Dkt. No. 123. That is, Parents assert that because Student's "stay put" placement based on his February 29, 2016 IEP is AMS (*see* OB at 14, Dkt. No. 123 (citing Stay Put Stipulation, Dkt. No. 118)), the DOE is the "true party seeking relief in this case" because it "changed [Student]'s placement from AMS to Poʻokela in order to terminate its obligation to pay the monthly stipend of $14,062.50 to AMS" (OB at 15, 20–21, Dkt. No. 123; Reply Br. at 2–3, Dkt. No. 133 (arguing that because Parents "had already proven that Defendants failed to provide [Student] a FAPE at its public facilities and that AMS was an appropriate placement for [Student] . . . , [DOE was] attempting to remove its obligation to pay the private tuition at AMS under stay put")). These contentions are meritless.

In an administrative hearing challenging an IEP, the party "seeking relief" is the party who challenges the IEP. *Cf. Schaffer*, 546 U.S. at 62. This is the settled rule in the Ninth Circuit and elsewhere.[9] Nothing Parents cite provides authority for their contention that the DOE was actually the party seeking relief because Student's 2017 IEP recommended a new public placement even though Student was previously in a private placement pursuant to his IEP for the 2016–17 school year. *See, e.g.*, OB at 14 (arguing that Student's placement at AMS is "entitled to *res judicata*" but failing to demonstrate how Student's placement at Poʻokela Maui in the March 16, 2017 IEP involves the same "issues of fact or law" that this Court resolved in the May 17, 2018 Order Granting Pl.'s Mot. for J. Granting Reimbursement of Private Tuition, Case No. 1:11-cv-00523-DKW-KSC (D. Haw. May 17, 2018), Dkt. No. 116).

Accordingly, the Court AFFIRMS the Order Denying Parents' Motion to Establish Burden of Proof (Dkt. No. 97-20).

B.   ***Right to Present Evidence***

---

[9]Parents' Opening Brief states that "[t]his identical issue is currently pending before the U.S. Court of Appeals for the Ninth Circuit in *J.M., et al. v. Kathryn Matayoshi, et al.*, USCA Case No. 16-17327" (OB at 12 n.4, Dkt. No. 123), further noting that oral arguments in *J.M.* were scheduled to take place in June 2018. At oral argument on this Motion on July 20, 2018, counsel for both parties stated that the Ninth Circuit had issued its Memorandum Disposition in *J.M.* According to Plaintiffs, the Ninth Circuit denied the appeal because the burden of proof issue was not raised at the administrative hearing or in district court, but a petition for rehearing en banc had been filed. Defense Counsel, however, quoted from the Memorandum Disposition, in which the Ninth Circuit acknowledged that the burden of proof issue had been abandoned below, but also cited *Schaffer*, 546 U.S. 49, stating that the law is "settled" that the burden of proof in an administrative hearing is properly placed on the party seeking relief.

Under the IDEA, "[a]ny party to a [due process] hearing . . . shall be accorded . . . the right to present evidence and confront, cross-examine, and compel the attendance of witnesses . . . ." 20 U.S.C. § 1415(h)(2). Parents contend that their right to present evidence was violated when AHO Somerville declined to conduct a site visit of AMS prior to the four-day administrative hearing on Parents' May 5, 2017 Due Process Complaint or prior to issuing the Decision. OB at 23, Dkt. No. 123 ("AHO Somerville's comment that testimony is sufficient to describe the placement is akin to saying witness statements and photos of the Grand Canyon are sufficient to appreciate the Arizona landmark. AHO Somerville should have permitted the site visit as a means of Plaintiffs presenting evidence.").

Parents, however, cite no authority for the proposition that an AHO must conduct a site visit to the existing placement site and/or the proposed placement site prior to creating or finalizing an IEP. Parents also fail to identify any prejudice or other tangible harm caused by AHO Somerville's refusal to visit AMS prior to developing the March 16, 2017 IEP. *See Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 485 (D. Md. 2002) ("[T]here needs to be harm to the child as the result of a procedural violation in order that an otherwise proper IEP decision may be invalidated by a court. To the extent that a procedural violation does not actually interfere with the provision of a free appropriate public education, such a violation is not sufficient to support a finding that an agency failed to provide a

FAPE.") (citing *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997)); *cf. W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992) ("[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." (internal citations omitted)), *superseded in part by statute on other grounds*, as stated in *J.K. v. Missoula Cty. Pub. Schs.*, 713 Fed. Appx. 666, 668 (9th Cir. 2018).

Accordingly, the Order Denying Parents' Site Visit Request (Dkt. No. 97-19) is AFFIRMED.

## III.  **AHO Somerville's December 20, 2017 Decision**

### A.  *Least Restrictive Environment*

The IDEA's LRE requirement is laid out in 20 U.S.C. § 1412(a).  Section 1412(a) provides that each state must establish procedures to assure that:

> [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  This LRE provision "sets forth Congress's preference for educating children with disabilities in regular classrooms with their peers." *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1403 (9th Cir.

1994) (citing, *inter alia*, *Dep't of Educ. v. Katherine D.*, 727 F.2d 809, 817 (9th Cir. 1983); *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1213 (3d Cir. 1993), as corrected (June 23, 1993)).  The implementing regulations, in turn, require school districts to ensure that a "continuum of alternative placements is available to meet the needs of children with disabilities," including "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions."  34 C.F.R. § 300.115(a), (b)(1).  Placement options that facilitate mainstreaming are said to be less "restrictive" than are options that would cause the disabled child to be more isolated than "appropriate" under the child's unique circumstances.  *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) ("After considering an appropriate continuum of alternative placements, the school district must place each disabled child in the least restrictive educational environment that is consonant with his or her needs.").  "Because every child is unique, 'determining whether a student has been placed in the "least restrictive environment" requires a flexible, fact-specific analysis.'"  *Id.* (quoting *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 113 (2d Cir. 2008)).

To perform this analysis, courts in the Ninth Circuit employ a four-factor balancing test, which considers (1) "the educational benefits of placement full-time in a regular class"; (2) "the non-academic benefits of such placement"; (3) "the

effect [that the disabled child] had on the teacher and children in the regular class";

and (4) "the costs of mainstreaming [the child]." *Rachel H.*, 14 F.3d at 1404;

*accord B.E.L. v. Haw. Dep't of Educ.*, 711 Fed. Appx. 426, 427 (9th Cir. Feb. 14,

2018) (quoting *Rachel H.*, *supra*); *Baquerizo v. Garden Grove Unified Sch. Dist.*,

826 F.3d 1179, 1187 (9th Cir. 2016) (same).[10]  According to the Decision:

> The IEP team's LRE discussion at the March 16, 2017 IEP
> meeting followed the first three factors listed in *Rachel H*. The
> IEP team did not consider the cost of mainstreaming Student
> into the Home School; however, the Hearings Officer finds
> that the cost of Student's education played no role in the
> Principal's decision making process.

Decision at 26, Dkt. No. 97-29.

Despite Parents' contention that the team's LRE discussion was inadequate

(*see* OB at 27, Dkt. No. 123), the Court holds that the AHO adequately addressed

the IEP team's consideration of the *Rachel H.* factors and conclusion that when

"applying the facts of the case to the LRE standard, the [public separate facility]

would provide Student with the LRE."  Decision at 26, Dkt. No. 97-29.

Accordingly, the Decision's holding is AFFIRMED.

### 1.    *Student's Access to "Neuro-Typical" Peers*

---

[10]Parents have offered no authority to support their argument that the AHO was also required to examine "the potential harm to [Student] or the quality of services at" each placement option along the LRE continuum "in her legal analysis of LRE."  OB at 27, Dkt. No. 123.  The Court therefore does not separately address the IEP team's discussion of these, except to note that potential harms were discussed with respect to each of the placement environments that the IEP team reviewed on March 16, 2017.  *See, e.g.*, Decision at 13–14 (FOFs 61–62), Dkt. No. 97-29.

In leading the IEP team's LRE discussion during the March 16, 2017 meeting, Principal Wittenburg used a worksheet entitled "Least Restrictive Environment; Justification for Placement." That worksheet lists placement options, from most-to-least restrictive and provides space for notes on each option in light of the first three *Rachel H.* factors. *See* Mar. 17, 2017 PWN ¶ 3, Dkt. No. 103-11 at 4. The IEP team discussed Student's access to both disabled and "neuro-typical" peers in each educational setting along the LRE continuum, while special education teacher Julia Whiteley took notes on the worksheet, categorizing discussion points as either positive ("+") or negative ("-").[11] Decision at 11–15

---

[11]The Decision includes the following representation of the completed worksheet with Whiteley's annotations:

| PLACEMENT | DECISION | RATIONALE | | |
|---|---|---|---|---|
| | | **Factor 1** | **Factor 2** | **Factor 3** |
| **General Education Setting (80% or more of the school day)** | REJECT | + Respond to being with peers<br>- Needs smaller environment | Overstimulated and unable to | Behaviors impede others |
| **General Education and Special Education Setting** | REJECT | - Curriculum not meaningful<br>+ Path to diploma | Negative reaction to neurotypical peers | Behaviors and accommodation/ Modifications impede |
| **Special Education Setting** | REJECT | + Implement aspects of IEP | - Safety Concerns<br>- Large environment<br>- Overstimulated<br>- Isolated | + Member of classroom |
| **Public Separate Facility** | ACCEPT | + IEP implemented<br>+ Functional Programming with small group and individual | - Transition to new staff/program/location<br>+ Similar peers<br>+ Access to the community<br>+ Functional life skills<br>+ Cooperative skills<br>+ Community-based lessons | + Member of Classroom<br>+ No foreseeable negative effects on teacher and children<br>+ Group of friends |
| **Private Separate Facility** | | | + Longevity of current program | |
| **Public Residential Facility** | | | | |
| **Private Residential Facility** | | | | |
| **Homebound/Hospital** | | | | |

(FOFs 58–64), Dkt. No. 97-29.

The IEP team began its LRE discussion on March 16, 2017 with the possibility of placement in a "general education setting" at Student's "Home School," Lokelani Intermediate School. Regarding the benefits that such a full-time placement in the general education setting would present, Father stated that "Student keeps a distance from neurotypical peers, because they are upsetting to him," so "[i]f Student was placed in a regular classroom, he would not work," he would be "overstimulated," and there would therefore "be no educational benefit" to him. Decision at 12 (FOF 59), Dkt. No. 97-29 (citing, in relevant part, Resp. Admin. Ex. 7 at 1009 [CD of IEP Meeting (Mar. 16, 2017)] at 11:07–19:50, Dkt. No. 105-5 at 17). Instead, "Student benefits from being with children with ASD." *Id*. Father further explained that even from a non-academic point of view, "being with [neuro-typical] peers would have an adverse effect on Student." *Id*. Father told the IEP team that Student "would be disruptive to other students" in such a setting. *Id*. *See Rachel H.*, 14 F.3d at 1404 (noting that the first two factors involve the non-educational and educational benefits of a placement option, and the third factor examines the effect that the Student would have on the teacher and children in the classroom at that placement). Principal Wittenburg "rejected

---

Decision at 15 (FOF 64), 29, Dkt. No. 97-29 (summarizing Resp. Admin Ex. 2 [Worksheet (annotated)] at 83, Dkt. No. 104-3 at 56).

placement in the general education setting based on their discussion." Tr. of Admin. Hr'g (Nov. 1, 2017) at 32[3]–24 (Wittenburg), Dkt. No. 101.

The IEP team then discussed placement in a "general and special education setting," which for Student would also be at Lokelani Intermediate School. In this placement setting, Student would benefit from being "on a diploma path," but Father reiterated that "it would be 'ridiculous' for Student to be in general education" because "he would receive no benefit, and it would be detrimental for him and the class." Decision at 13 (FOF 60), Dkt. No. 97-29 (citing CD of IEP Meeting (Mar. 16, 2017) at 11:07–19:50, Dkt. No. 105-5 at 17). Father also told the IEP team "that Student would not benefit from the [special education] classroom [at Lokelani Intermediate School] because of the close proximity to the neurotypical peers on campus." *Id.* (noting that Parents even "had to ask the Charter School not to be so close to the outside of the private facility's building because [it] causes Student to have negative reactions inside the building," and Mother noted that "[w]hen the Charter School would hold 'morning circle,' Student would scream when he walked by"). Principal Wittenburg rejected placement in the general and special education setting based on this discussion. *Id.*

Next, the IEP team discussed placement in a special-education-only setting. For Student, such a setting would be offered via the special education classroom at Lokelani Intermediate School, which includes "a very small group of children,

some of whom ha[ve] ASD." Decision at 13 (FOF 61), Dkt. No. 97-29 (citing CD

of IEP Meeting (Mar. 16, 2017) at 26:58–33:25, Dkt. No. 105-5 at 17; Tr. of

Admin. Proceedings (Nov. 1, 2017) at 322–24 (Wittenburg), Dkt. No. 101).

During the discussion, Mother expressed her view that *any* change of placement

would involve a difficult and potentially harmful transition for Student, but

Principal Wittenburg explained that the IEP team still had to review each

placement setting on the LRE continuum before making its offer of FAPE:

> Mother stated that if Student is doing well in one place, with
> people that know him and have a history with him, he should
> not be moved. She said to move him from one building to
> another for the "school's convenience" would not serve
> Student's unique needs. She stated it was not "one-size-fits-all"
> and referenced the worksheet. The Principal responded that
> they needed to discuss the three factors for each placement
> option. Mother felt that if the team was talking about a
> transition or change, it would be more restrictive for Student's
> unique needs because he would need more than one skills
> trainer. The Principal responded that they had not made a
> decision yet, and they were still going through the LRE
> continuum and were focusing on Student's needs.

Decision at 13 (FOF 61), Dkt. No. 97-29 (citing CD of IEP Meeting (Mar. 16,

2017) at 26:58–33:25, Dkt. No. 105-5 at 17; Tr. of Admin. Proceedings (Nov. 1,

2017) at 322–24 (Wittenburg), Dkt. No. 101). Although there was evidence

suggesting that "aspects of Student's IEP" could be implemented in the special

education setting, Parents testified that "[i]t would be overstimulating" for Student

to be placed in "the large environment" of Lokelani Intermediate School, which

could even present "safety concerns" for Student if placed there. *Id*. ("Father said when Student was in a DOE School previously, he was isolated from his peers, did not have his needs met, and it was not beneficial."). Principal Wittenburg rejected placement in the special education setting based on this discussion. *Id*.; *see also* Decision at 27–28, Dkt. No. 97-29.

The IEP team then moved to discuss placement at a DOE public separate facility. For Student, as of March 16, 2017, that meant Poʻokela Maui, a brand new DOE school with a handful of enrolled students "between grades five and nine" who have "various disabilities, primarily autism." Tr. of Admin. Hr'g (Nov. 1, 2017) at 416–17 (Whiteley), Dkt. No. 101 (discussing her familiarity with Poʻokela Maui prior to the March 16, 2017 IEP meeting based on "several" past site visits). "Parents readily participated[,] and the [public separate facility] discussion lasted 27 minutes." Decision at 24, Dkt. No. 97-29. The special education teacher opined that "the IEP could be implemented [at Poʻokela Maui], specific functional programming could also be implemented," and that there would be "individual learning opportunities" there for Student. Decision at 14 (FOF 62), Dkt. No. 97-29 (noting that other team members with first-hand knowledge similarly explained that Poʻokela Maui "focused on functional skills, CBI [community-based instruction], and cooperative skills" (citing, in relevant part, CD of IEP Meeting (Mar. 16, 2017) at 33:32–1:00:42)). Although no neuro-typical

peers would be "regularly" present at Poʻokela Maui, members of the IEP team noted that Poʻokela students would have opportunities for community interaction—both by visiting Lokelani Intermediate School and by taking community outings to restaurants and stores around Tech Park, where Poʻokela Maui is located. *See* Decision at 10 (FOFs 42–44), Dkt. No. 97-29 (citing, in relevant part, Tr. of Admin. Hr'g (Nov. 1, 2017) at 327 (Wittenburg), Dkt. No. 101); *see also* Tr. of Admin. Hr'g (Nov. 1, 2017) at 331–32, 365–66, 372–73 (Wittenburg), Dkt. No. 101 (explaining that Poʻokela Maui is approximately one-half mile from the Lokelani Intermediate School campus and describing Tech Park, acknowledging that grocery stores are located in "a different part of Kihei"). These outings would take place, together with "general education peers" from Lokelani Intermediate School, as frequently as "appropriate" and necessary to implement each student's individual IEP. Tr. of Admin. Hr'g (Nov. 1, 2017) at 372–73 (Wittenburg), Dkt. No. 101; Tr. of Admin. Hr'g (Nov. 2, 2017) at 418, 421, 460–61 (Whiteley), Dkt. No. 102. Accordingly, Student's "non-academic benefits" at Poʻokela Maui would also include "opportunities to integrate into the community." Mar. 17, 2017 PWN at 4, Dkt. No. 103-11.[12] Nonetheless, Parents,

---

[12]These accessible, yet irregular, opportunities appeared appropriate, or, particularly in Student's circumstance, even desirable, given Parents' comments about his level of discomfort with neuro-typical peers.

who had not yet visited Poʻokela Maui, mostly focused on the negative aspects of a

possible placement there:

> Mother said the "down-side" [of the public separate facility]
> was [that Parents] had filed a "state complaint" against [the
> autism resource teacher serving as BCBA at Poʻokela Maui],
> and "that would be a problem." Father stated he couldn't speak
> about the facility, because it was brand new. Student's program
> at the private [AMS] facility was seven years old, and he had
> familiar people there that worked with him and knew his issues.
> Father said that Student has extreme needs, and placement at
> the [public separate facility] was not in his best interest. . . .
> Mother stated that she was not sure if the community activities
> could be implemented [at Poʻokela Maui,] noted the [public
> separate facility's] location at "Lipoa[,]" and [questioned] if
> [Student's] individual needs could be met there.

Decision at 14 (FOF 62), Dkt. No. 97-29 (citing, in relevant part, CD of IEP

Meeting (Mar. 16, 2017) at 33:32–1:00:42).

In light of all the information provided, Principal Wittenburg concluded that

the first three *Rachel H.* factors suggested that Student would benefit academically

and non-academically, and he would not negatively impact the teachers and

children in the classroom, at the public separate facility, Poʻokela Maui.

Therefore, the least restrictive environment on the LRE continuum in which DOE

could provide Student with a FAPE, in accordance with his needs identified in the

March 16, 2017 IEP, was Poʻokela Maui. *See* Mar. 16, 2017 IEP at ¶ 23, Dkt. No.

103-9 (explaining that Student would "participate with disabled peers during all

school hours in a public separate facility" and would "have opportunities to

interact with non-disable[d] peers during community outings"). Accordingly, Principal Wittenburg "[r]ejected placement at a private separate facility" such as AMS in favor of placement at the new public separate facility, Poʻokela Maui. Mar. 17, 2017 PWN ¶ 3, Dkt. No. 103-11 at 4.

## 2. *The "Cost of Mainstreaming" Factor*

Parents' argument that the DOE violated the IDEA by failing to address the fourth *Rachel H.* factor regarding costs of mainstreaming Student is inapposite. OB at 25–27, Dkt. No. 123; Reply at 5, 11, Dkt. No. 133. First, the Record reveals that Father did, in fact, raise the issue of cost at the March 16, 2017 IEP meeting when he accused Principal Wittenburg of following "'marching orders' from the DOE district to cut costs" in making the public separate facility recommendation. Decision at 14–15 (FOF 63), Dkt. No. 97-29 (citing CD of IEP Meeting (Mar. 16, 2017) at 1:00:43–1:05:05, 00:00–12:57, Dkt. No. 105-5 at 17). Principal Wittenburg denied having any such "marching orders," however, and she explained that she "accepted the [public separate facility] to be the LRE," which is why she "made an offer of FAPE at the [public separate facility]." Decision at 24, Dkt. No. 97-29; Decision at 14–15 (FOF 63), Dkt. No. 97-29 (citing CD of IEP Meeting (Mar. 16, 2017) at 1:00:43–1:05:05, 00:00–12:57, Dkt. No. 105-5 at 17). Second, even though the IEP team "did not [explicitly] consider the cost of mainstreaming Student into the Home School" during its March 16, 2017 LRE

discussion, AHO Somerville expressly found "that the cost of Student's education played no role in the Principal's decision-making process." Decision at 26, Dkt. No. 97-29. And third, even if any one of the *Rachel H.* factors is not specifically discussed during the development of an IEP, the challenging party "must still show prejudice from such a failure." *K.K. ex rel. K.S.K. v. Hawaii*, 2015 WL 4611947, *18, *20 (D. Haw. July 30, 2015) (noting that a failure to discuss the factors would be a procedural inadequacy that plaintiffs must demonstrate "resulted in the loss of educational opportunity or infringement on their ability to participate in the formulation of the IEP" (citing *L.M.*, 556 F.3d at 909)). Yet Parents have made no such showing in this case.

Accordingly, the IEP team did not reversibly err by, according to Parents, failing to include the "cost" factor in its LRE discussion prior to recommending placement at a public separate facility.

### 3. *Examining* Every *Option on the LRE Continuum*

Parents also argue that "AHO Somerville erred by failing to require a comparison of [Student]'s current placement at AMS to any proposed change in placement in the legal analysis of [the] decision on LRE, including whether Po'okela was a less or more restrictive environment than AMS." OB at 26–27, Dkt. No. 123; Reply at 11–23, Dkt. No. 133. This argument fails for two reasons.

First, Parents provide no authority for the contention that *all* possibilities on the LRE continuum *must* be discussed before a placement recommendation can be made. Here, in addition to the possible placement settings the IEP team did discuss—(1) General Education Setting (80% or more of the school day), (2) General Education and Special Education Setting, (3) Special Education Setting; (4) Public Separate Facility—the LRE continuum includes four more restrictive placement environments—(5) Private Separate Facility, (6) Public Residential Facility, (7) Private Residential Facility, and (8) Homebound/Hospital. *See* Worksheet (annotated), Dkt. No. 104-3 at 56. If Parents' arguments were correct, the IEP team would have been required to conduct in-depth discussions of AMS in addition to the other three, *more* restrictive options than a public separate facility. *See T.M.*, 752 F.3d at 161; 34 C.F.R. § 300.115(a), (b)(1). But Principal Wittenburg properly rejected these options without formal discussion because under the IDEA, special education should be delivered in the *least* restrictive environment. Mar. 17, 2017 PWN at 4, Dkt. No. 103-11.

Second, the Administrative Record shows that Poʻokela Maui was more appropriate than AMS as the least restrictive environment for Student under the provisions of his March 16, 2017 IEP. Indeed, AHO Somerville found that the public separate facility would provide Student with more access to neurotypical peers and the community as a whole than would AMS. *See, e.g., K.D. ex rel. C.L.*

*v. Dep't of Educ.*, 665 F.3d 1110, 1128 (9th Cir. 2011) (noting that public placement was "more appropriate" than the private option as the LRE because the specific IEP at issue "included provisions providing that [student] would have the opportunity to interact with non-disabled peers"). The facts support this finding.

That is, Parents discussed Student's program at AMS during each of the IEP team's meetings to develop Student's IEP for the 2017–18 school year, and they provided additional information via correspondence. *See, e.g.*, Pet'rs' Admin. Ex. 7 [Parents' Mar. 14, 2017 Letter], Dkt. No. 103-8. As of March 16, 2017, the IEP team therefore knew that AMS is a private facility with "12 full-time students that have high functioning ASD" (Decision at 6 (FOF 9), Dkt. No. 97-29 (citing, in relevant part, Admin Tr. (Oct. 30, 2017) at 45–46 (Father), Dkt. No. 99) and that it "shares a campus with a DOE Charter School" (Decision at 5–6 (FOF 8), Dkt. No. 97-29 (citing Admin Tr. (Oct. 30, 2017) at 44 (Father), Dkt. No. 99; Admin. Tr. (Nov. 2, 2016) at 499 (Whiteley), Dkt. No. 102). Although Parents later contended that Student's "program is on the same church grounds as the local public charter school," so he therefore "has access to normally developing peers daily" at AMS (Pet'rs' Admin. Ex. 9 [Parents' Mar. 16, 2017 Letter] at 2, Dkt. No. 103-10)), the IEP team possessed information indicating that such contact and access was, at least in Student's case, deleterious and not advantageous. For example, in their March 14, 2017 letter, Parents informed members of the IEP team that the charter

school had "politely agreed to move their morning circle assembly as they had noted that it was causing self-injurious behaviors for my son due to their meeting proximity." Parents' Mar. 14, 2017 Letter, Dkt. No. 103-8. Moreover, the special education teacher (Whiteley), who had "observed Student at the private facility on May 6, 2016, May 18, 2016, August 22, 2016, and October 4, 2016," noted that she had "never observed Student interacting with typically developing peers, higher-functioning children with ASD, or with general education students at the Charter School" on any of her visits to AMS. Decision at 10 (FOF 41), Dkt. No. 97-29 (citing Resp. Admin. Ex. [3] [Whiteley AMS Observation Forms] at 309–11 (Dec. 13, 2016), 321–23 (Oct. 4, 2016), 329–31 (Aug. 22, 2016), 344–45 (May 6, 2016), 346[–47] (May 18, 2016), Dkt. No. 104-5; Tr. of Admin. Hr'g (Nov. 1, 2016) at 431–32 (Whiteley), Dkt. No. 101; Tr. of Admin. Hr'g (Nov. 2, 2016) at 499–502 (Whiteley), Dkt. No. 102).[13]

Other testimony at the administrative hearing also revealed that at AMS, Student had "no planned inclusion activities with neurotypical peers from other schools" and "[i]nteraction with neurotypical peers in the community is not coordinated." Decision at 7 (FOF 22), Dkt. No. 97-29 ("Student will go to place,

_____

[13]In fact, Whiteley never observed Student interacting with *any* other children or students at AMS. *See, e.g.*, Decision at 10 (FOF 40), Dkt. No. 97-29 ("On February 5, 2016, the [special education] teacher observed Student at [AMS] for one hour and 15 minutes. During that time, two dividers separated Student from the rest of the class. When the class exited the room for an outside activity, Student remained behind and continued with his table activity, isolated from his peers." (citing Resp. Admin. Ex. 3 at 351 [Whiteley Event Log (Feb. 5, 2016)], Dkt. No. 104-5)).

such as a park, in anticipation that other children will be there." (citing Admin Tr. (Oct. 31, 2017) at 253–55 (Glasgow), Dkt. No. 100)).  Although AMS was arguably closer to the center of Kihei town, being located next to Kihei Charter School and near grocery stores and parks, students at Poʻokela Maui could engage in community outings to stores or restaurants in the Tech Park area or to Lokelani Intermediate School, located one-half mile away, which "could occur daily" if appropriate to implement their individual IEPs.  Tr. of Admin. Hr'g (Nov. 2, 2017) at 495–96, 511 (Whiteley), Dkt. No. 102.

As such, the record supports Whiteley's explanation that Poʻokela Maui was "less restrictive" than AMS because its students "had more access to general education peers" at Lokelani Intermediate School, "as well as a more functional program" for community interactions.  Tr. of Admin. Hr'g (Nov. 2, 2017) at 495–96, 511 (Whiteley), Dkt. No. 102.  The Court therefore declines to disturb the conclusion of both the IEP team and the AHO that the public separate facility was the LRE for Student and an appropriate placement under the March 16, 2017 IEP.

B.    *Pre-Determination*

Under the IDEA, a school district may not determine a placement for the student before the IEP meeting; rather, "the general rule is that placement should be based on the IEP."  *Spielberg v. Henrico Cty Pub. Schs.*, 853 F.2d 256, 259 (4th Cir. 1988) (basing its holding on the "spirit and intent of the EHA [the predecessor

to the IDEA], which emphasizes parental involvement"); *accord Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 857 (6th Cir. 2004) (quoting *Spielberg*, *supra*), *cert. denied*, 546 U.S. 936 (2005); *see also W.G.*, 960 F.2d at 1484 (finding that predetermination of placement prior to formation of an IEP is impermissible under the IDEA).  As such, the logical progression of developing an annual IEP would first require the team to identify the student's needed programs and services, research placement options, and only after doing so, make its final placement decision in light of this information.

Parents argue that four lines of evidence demonstrate that the team did not follow this logical progression but instead impermissibly pre-determined that Student's placement would be changed to Poʻokela Maui.  A review of the facts in the Administrative Record, however, evidences otherwise.

1.  *Conversation with District Resource Teacher Chad Takakura at the Poʻokela Maui Open House*

After the March 16, 2017 IEP meeting, Parents visited Poʻokela Maui and met Chad Takakura, a licensed special education and autism teacher there.  Tr. of Admin. Hr'g (Nov. 1, 2017) at 433 (Whiteley), Dkt. No. 101; Tr. of Admin. Hr'g (Nov. 2, 2017) at 534–35 (Ballinger), Dkt. No. 102.  In the letter that Parents sent to Principal Wittenburg after this visit, Parents "alleged that the Principal predetermined Student's placement at the [public separate facility], based on their discussions with [Takakura]."  Decision at 17 (FOF 81), Dkt. No. 97-29 (citing

Parents' Mar. 16, 2017 Letter, Dkt. No. 103-10).  According to Father, Takakura "told him that . . . Principal [Wittenburg] had visited the [facility] earlier in the week and told him that Student would be attending school there."  Decision at 17 (FOF 76), Dkt. No. 97-29 (citing Tr. of Admin. Hr'g (Oct. 30, 2017) at 42–43, 79 (Father), Dkt. No. 99; Tr. of Admin. Hr'g (Oct. 31, 2017) at 288–89 (Mother), Dkt. No. 100).

However, Principal Wittenburg "testified that she never had a discussion about Student with [Takakura]."  Decision at 17 (FOF 78), Dkt. No. 97-29 (citing Tr. of Admin. Hr'g (Nov. 1, 2017) at 332 (Wittenburg), Dkt. No. 101).  And Takakura did not testify during the Administrative Hearing, notwithstanding his appearance on the DOE's witness list.  *See* DOE Admin. Witness List ¶ 4, Dkt. No. 104-1 at 3.

AHO Somerville found Principal Wittenburg's testimony on the topic "to be more credible" than Parents' testimony (Decision at 25, Dkt. No. 97-29), and the Court defers to this determination under the facts before it.  *See B.S.*, 82 F.3d at 1499; *Wartenberg*, 59 F.3d at 891 (citation omitted); *L.E.*, 435 F.3d at 389 n.4 (explaining that a district court must accept the administrative hearings officer's credibility determinations "unless the nontestimonial, extrinsic evidence in the record would justify a contrary conclusion." (citation omitted)).  Indeed, Parents have failed to offer any evidence calling Principal Wittenburg's testimony into

question. Furthermore, Principal Wittenburg's site visit to Poʻokela Maui prior to

making the March 16, 2017 offer of FAPE there appears to represent due diligence.

*Cf. K.D.*, 665 F.3d at 1123 ("[T]he fact that the DOE scouted out [the eventual

placement setting] as a potential of placement for the . . . IEP [at issue] is not

conclusive evidence that the DOE had decided to place [the child] there . . . ."

(citation omitted)).

Parents have not shown that Principal Wittenburg pre-determined Student's

2017–18 placement based on any conversation she had with Takakura while

visiting the Poʻokela Maui campus prior to the final IEP meeting.

### 2. *Inclusion of Bus Transportation in the March 16, 2017 IEP*

Parents also argue that the fact that DOE representatives wanted to discuss

the possibility of Student needing state-facilitated transportation under the March

16, 2017 IEP shows that the DOE had already decided to change Student's

placement prior to finalizing that IEP. OB at 22, Dkt. No. 123 (citing Tr. of

Admin. Hr'g (Oct. 31, 2017) at 281–83, Dkt. No. 100) ("Transportation,

presumably to Poʻokela, was inserted in the draft IEP during the March 13, 2017

IEP meeting."); Reply at 10–11, Dkt. No. 133 ("If placement was not yet decided,

there would be no need to discuss transportation[, which] is a related service to be

included in an IEP <u>only</u> 'if required to provide special transportation for a child

with a disability.'") (quoting 34 C.F.R. § 300.34(c)(16)(iii)). They argue that this

is evidence of pre-determination, in-part because Parents—who work at Student's previous placement, AMS—have always refused transportation as part of Student's prior IEPs.  In fact, Mother testified that she declined transportation services during the March 15, 2017 meeting, but one of the district resource teachers "insisted that she accept."  Decision at 11–12 (FOF 55), Dkt. No. 97-29 (citing, in relevant part, Tr. of Admin. Hr'g (Oct. 31, 2017) at 281–84 (Mother), Dkt. No. 100).

Parents, in other words, seek to penalize the IEP team for its thoroughness.  Indeed, AHO Somerville described the transportation issue as follows:

> At the March 15, 2017 IEP meeting, [one of the district resource teachers] discussed busing as a transportation option.  Parents said that Student would need an aid when riding the bus, and the IEP team said that this would be addressed through a transition plan.  When Mother questioned why transportation services were not in Student's previous IEP, [the teacher] stated that this was a [special education] service offered to all eligible students, and she preferred to include it in the IEP.  Father was not opposed to this, and stated that Student needed to learn how to ride the bus.  There was no evidence to support Petitioners' claim of predetermination from the IEP team's offer of transportation services.

Decision at 23, Dkt. No. 97-29 (explaining that "[t]he audio recording of the IEP meeting [was] quite different from Mother's recollection" that DOE officials insisted that she accept transportation services, "calling her credibility into question"); *accord* Decision at 11 (FOF 54) (citing Resp. Admin. Ex. 7 at 1008 [CD2 of IEP Meeting (Mar. 15, 2017)] at 49:40-51:23, Dkt. No. 105-5 at 16).  And

despite Parents' contention (Reply at 10–11, Dkt. No. 133), there is no prohibition on including services that only *might* be necessary in a student's IEP. *See* 34 C.F.R. § 300.34(c)(16)(iii).

Additionally, Parents take issue with AHO Somerville's conclusion about the adequacy of a "transition plan" in the March 16, 2017 IEP—namely, they argue that the DOE merely made a plan to make a plan, which they allege is not adequate under the IDEA. *See* OB at 27–29, 35–36, Dkt. No. 123. But the fact that the IEP team included elements such as bus transportation can be seen as an aspect of the very transition plan Parents claim was absent.[14] Moreover, and perhaps more importantly, "a transition plan may be created (and appropriately developed) after an IEP has been completed." *Anthony C. ex rel. Linda C. v. Dep't of Educ.*, 2014 WL 587848, *10 (D. Haw. Feb. 14, 2014) (citation omitted). Indeed, the logical progression of the annual IEP involves developing a plan, and *then* determining whether the State can implement that plan at a suggested placement along the continuum of placement options. *See Spielberg*, 853 F.2d at 259. It makes sense, then, that without knowing where the suggested placement would be, DOE was thoroughly planning by provisionally addressing potential transportation services.

---

[14]Perhaps tellingly, Parents find fault with the very offer of transportation services and then do so again when insufficient details regarding those services is described.

Moreover, it appears a concerted effort was made to begin developing a transition plan in consultation with Parents, but no such planning meeting ever took place due to Parents' unavailability and the instant federal lawsuit. *See* Decision at 19 (FOFs 87–92), Dkt. No. 97-29 (citing, in relevant part, Resp. Admin. Ex. 4 at 378 [Mar. 24, 2017 Wittenburg Letter], 376 [Mar. 29, 2017 Whiteley Email], 374 [Mar. 29, 2017 Whiteley Email], 372 [Mar. 31, 2017 Whiteley Email], Dkt. No. 104-6; Resp. Admin. Ex. 1 at 21–26 [Parents' Mar. 31, 2017 Correspondence & Due Process Request], Dkt. No. 104-2 (noting that Parents were in Israel and would be unable to participate in any meetings until they returned—i.e., until the week of April 24, 2017)). As such, the following conclusion in AHO Somerville's Decision is supported by the Administrative Record:

> The IEP included a transition plan to a [public separate facility]. The transition plan would occur prior to and during Student's change of placement. The IEP stated, "[b]ecause student had been in private separate facility for some time, a transition plan will be implemented to mitigate any potential harmful impact [to] him moving to a less restrictive environment and transitioning to a new school. Factors to consider for transition will include new people, new location, self-injurious behaviors, potential regression, access to the community, new program routines." The DOE tried to schedule a transition plan meeting with Parents, but they were out of the country. Soon thereafter, the [Due Process Complaint] was filed.

Decision at 32, Dkt. No. 97-29.

Accordingly, addressing transportation services in the March 16, 2017 IEP is not evidence of pre-determination.

### 3. *Pre-Printed Form*

Parents have also argued that the DOE arrived at the March 16, 2017 meeting with "a pre-printed IEP indicating placement (under the Least Restrictive Environment or LRE) as Poʻokela Maui," which they claim is evidence of pre-determination. Due Process Compl. at 3, Dkt. No. 97-2; *see also* Tr. of Admin. Hr'g. (Oct. 30, 2017) at 37 (Father), Dkt. No. 99. However, Father acknowledged during the Administrative Hearing before AHO Somerville that he did not receive any draft IEP *with the placement recommendation filled out* prior to or at the start of the IEP meeting on March 16, 2017. Tr. of Admin. Hr'g (Oct. 30, 2017) at 77–78, Dkt. No. 99 ("If I insinuated that I received th[e] [March 16, 2017 IEP] at [the] March 16 meeting, that is not true."); *accord* Tr. of Admin. Hr'g (Nov. 2, 2017) at 467–68, 476–77 (Whiteley), Dkt. No. 102 (confirming that the draft IEP at the March 16, 2017 meeting did not have placement filled in). Moreover, even if the placement recommendation had been written into the draft prior to the March 16, 2017 meeting, it is not clear that such a fact would evidence pre-determination. *See Deal*, 392 F.3d at 858 (explaining that school officials are generally "permitted to form opinions and compile results prior to IEP meetings" so long as those officials "come to the meeting with suggestions and open minds, not a required

course of action") (citing *N.L. ex rel. Mrs. C. v. Knox Cty. Schs.*, 315 F.3d 688, 693–94 n.3 (6th Cir. 2003)).  And "[s]o long as they do not deprive parents of the opportunity to meaningfully participate in the IEP development process, draft IEPs are not impermissible under the IDEA."  *M.M. ex rel. A.M. v. New York City Dep't of Educ.*, 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) (citing *Deal*, 392 F.3d at 858; *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 611 (6th Cir. 2006)).  Parents offer no further evidence.

Accordingly, the Court holds that the fact that members of the IEP team may have arrived at the March 16, 2017 meeting with print-outs of a draft IEP is not evidence of pre-determination.

### 4.    *Parental Participation*

Parents argue that because Poʻokela Maui and other potential, non-AMS placements were not discussed until the fifth and final IEP meeting on March 16, 2017, they were denied full participation in the IEP process.  OB at 29–33, Dkt. No. 123; *see also, e.g.*, Tr. of Admin. Hr'g (Oct. 30, 2017) at 32–34 (Father), Dkt. No. 99; Tr. of Admin. Hr'g (Oct. 31, 2017) at 284, 313 (Mother), Dkt. No. 100. This argument fails for three reasons.

First, the record clearly shows that Parents *did* actively and substantially participate in the creation of Student's March 16, 2017 IEP.[15]  Indeed, Parents

---

[15] *See* Decision at 23, Dkt. No. 97-29 (distinguishing *Doug C. v. Haw. Dep't of Educ.*, 720 F.3d

attended all five IEP meetings (including the final meeting that focused on LRE and the placement decision) as members of the IEP team (*see, e.g.*, Tr. of Admin. Hr'g (Nov. 1, 2017) at 391, Dkt. No. 101), and by all accounts, they discussed AMS as their preferred placement for Student throughout the IEP development process. *See, e.g.*, Tr. of Admin. Hr'g (Nov. 1, 2017) at 324, 328, 350, 390–91 (Wittenburg), Dkt. No. 101 (stating that Parents "did talk a lot about AMS and the program and how [Student] was doing there" throughout all of the IEP meetings, including the meeting on March 16, 2017). *See Hanson*, 212 F. Supp. 2d at 487 (rejecting plaintiffs' assertion of a procedural violation because the parents "were present at all the meetings and were thereby given a full opportunity to participate in the formulation of the IEP"). Moreover, "[w]hen the IEP team discussed the option of placement in a [public separate facility] at the March 16, 2017 IEP meeting, Parents readily participated and the discussion lasted 27 minutes." Decision at 24, Dkt. No. 97-29; Tr. of Admin. Hr'g (Nov. 2, 2017) at 414–16, 421, 446, 455–56, 491, 507–08 (Whiteley), Dkt. No. 102 (stating that, although there was no "formal discussion" about a private separate facility during the March 16, 2017 IEP meeting, "[i]t was mentioned throughout the discussion" about other options on the LRE continuum). Indeed, contrary to their assertion that the final

---

1038 (9th Cir. 2013), "because the parent *was not present* at the IEP meeting, and the DOE held the meeting without him").

IEP meeting was cut short after Principal Wittenburg indicated that the March 16, 2017 IEP could be implemented at Poʻokela Maui (*see* Reply at 8, Dkt. No. 133 (suggesting that the DOE "refuse[d] to even discuss retaining [Student] at AMS and den[ied] Plaintiffs the opportunity to explain why AMS is the LRE for [Student]")), the record shows that Parents requested further discussion, and the IEP team complied. Decision at 24, Dkt. No. 97-29; *see also* Decision at 14–15 (FOF 63) (citing CD of IEP Meeting (Mar. 16, 2017) at 1:00:43–1:05:05, 00:00–12:57, Dkt. No. 105-5 at 17). Specifically, Mother "handed out documents regarding LRE to the IEP team," which the IEP team discussed for "approximately four minutes" before taking a short break. Decision at 24, Dkt. No. 97-29. As the Decision explains:

> [a]fter the break, the discussion lasted another 13 minutes. Parents raised their concerns about the [autism resource teacher at Poʻokela Maui], stated she was unethical, and they had another current complaint about her. Father stated there's "no way in hell I'm going to have her in charge of my kid's program." He further stated that if he had his way, the [autism resource teacher] would not have her BCBA license within a few months and the [public separate facility] would have to be run by someone else. Father said the [public separate facility] was a "joke" and was not an improvement over the private facility. . . Principal made an offer of FAPE at the [public separate facility]. Parents argued that all the placement options were not discussed and Principal replied that all the options, such as Home Hospital did not have to be discussed. Parents rejected the offer of FAPE and said they did not have ample discussion.

Decision at 24, Dkt. No. 97-29; *see also* Tr. of Admin. Hr'g (Nov. 1, 2017) at 390–91 (Wittenburg), Dkt. No. 101 (noting that she responded to Mother's concerns

about why placement should continue at AMS, and not at Poʻokela Maui, at the end of the March 16, 2017 meeting).

Second, Parents' contention that they were unable to *meaningfully* participate in the IEP formulation process because they were unaware of Poʻokela Maui prior to the March 16, 2017 IEP meeting is both contradicted by the record and legally unsound. Indeed, although Parents have repeatedly claimed that they had never heard of Poʻokela Maui until one hour and twenty minutes into the March 16, 2017 IEP meeting (*e.g.*, Tr. of Admin. Hr'g (Oct. 30, 2017) at 34 (Father), Dkt. No. 99; Tr. of Admin. Hr'g (Oct. 31, 2017) at 272 (Mother), Dkt. No. 100; Tr. of Admin. Hr'g (Nov. 2, 2017) at 581 (Father), Dkt. No. 102), AHO Somerville found that claim to be incredible based on testimony and other evidence in the Administrative Record:

> Father also testified that he had never heard of the [public separate facility Poʻokela Maui] until an hour and 20 minutes into the fifth IEP meeting. This is not true. At the IEP meeting, he did not ask specifics about the school. Instead he asked, "is it open?" The Principal [and one of the district resource teachers] said "yes." Then Father stated, "Lesley said they didn't have staff." Clearly, he was aware of [Poʻokela Maui], again calling his credibility into question.

> Similarly, Mother testified that they were not able to actively participate in the placement discussion, because they had no information about [Poʻokela Maui]. She testified that [she] did not know where [Poʻokela Maui] was or if it was open. However, at the IEP meeting Mother stated that she was not sure if the community activities could be implemented and if [Student's] individual needs could be met there, and noted the

46

> [public separate facility]'s location at "Lipoa." Obviously, Mother knew the general location of [Poʻokela Maui], again calling her credibility into question.

Decision at 25, Dkt. No. 97-29; *see, e.g.*, Decision at 14 (FOF 62), Dkt. No. 97-29 (citing, in relevant part, CD of IEP Meeting (Mar. 16, 2017) at 33:32–1:00:42, Dkt. No. 105-5 at 17). The Court defers to AHO Somerville's careful credibility determinations here and is unpersuaded by Parents' contention (*see* OB at 37–38, Dkt. No. 123) that AHO Somerville's findings are erroneous and/or do not support the above conclusion. *See B.S.*, 82 F.3d at 1499 (citations omitted); *Wartenberg*, 59 F.3d at 891 (citation omitted); *L.E.*, 435 F.3d at 389 n.4 (citation omitted).

Moreover, even if Parents had been ignorant of the existence of a public separate facility on Maui prior to the March 16, 2017 IEP meeting, there is nothing in the IDEA requiring the DOE to allow parents to visit the school of the proposed placement prior to finalizing their child's annual IEP. *See Hanson*, 212 F. Supp. 2d at 487 (noting the absence of caselaw "holding that under the IDEA parents must be permitted to observe the proposed placement prior to an IEP decision in order to be able to fully participate in the process"). Rather, the statute requires merely that parents be active partners in the process. Here, Parents did actively participate, as noted above. *Id.* As such, it is sufficient that other members of the IEP team had first-hand information to assist in determining whether Student's March 16, 2017 IEP could be implemented at Poʻokela Maui. *See, e.g.*, Tr. of

Admin. Hr'g (Nov. 1, 2017) at 400, 404–05, 407 (Wittenburg), Dkt. No. 101 (admitting that her own knowledge of the student population at Poʻokela Maui on March 16, 2017 was limited, but explaining that various other members of the IEP team provided information about the facility and whether Student's March 16, 2017 IEP could be implemented there).

Third, although the IDEA requires the DOE to provide Parents with an opportunity for meaningful participation in the development of an IEP, "the Act does not explicitly vest parents with a veto power over any proposal or determination advanced by the educational agency regarding a change in placement." Decision at 24, Dkt. No. 97-29 (citing *Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 368–69 (1996); 20 U.S.C. § 1401(19) (1982)); *see also Laddie C.*, 2009 WL 855966 at *4 ("The mere existence of a difference in opinion between a parent and the rest of the IEP team is not sufficient to show that the parent was denied full participation in the process, nor that the DOE's determination was incorrect."). Indeed, "[i]f the Parents do not agree with the DOE's offer [of FAPE], they do not have to accept it," and they "have the right to file a due process complaint pursuant to Hawaii Administrative Rules § 8-60-61." Decision at 24, Dkt. No. 97-29 (citing *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1490 (9th Cir. 1986) (explaining that if a consensus cannot be reached regarding the formulation of an IEP, "the agency has the duty to formulate the plan to the

best of its ability in accordance with information developed at the prior IEP meetings, but must afford the parents a due process hearing in regard to that plan"), *aff'd as modified sub nom. Honig v. Doe*, 484 U.S. 305 (1988)).  The instant matter arises out of just such a challenge by Parents.

The Court therefore holds that Parents "have not shown that the March 16, 2017 IEP denied Student a FAPE" (Decision at 32, Dkt. No. 97-29) and AFFIRMS the AHO's Decision.

## IV. <u>Parents' Request for Reimbursement</u>

A parent or guardian is "entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the Act." *Cty. of San Diego*, 93 F.3d at 1466 (citing *Florence Cty. Sch. Dist. 4 v. Carter*, 510 U.S. 7 (1993)).  Because the Court holds that the March 16, 2017 IEP does not deny Student a FAPE, Parents are not entitled to reimbursement for Student's private educational expenses via AMS during the 2017–18 school year.  *Baquerizo*, 826 F.3d at 1189 (citing *Cty. of San Diego*, 93 F.3d at 1466).

## <u>CONCLUSION</u>

The AHO's December 20, 2017 Decision (Dkt. No. 97-29) is AFFIRMED.

IT IS SO ORDERED.

DATED: August 7, 2018 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

*J. G. v. State Of Hawaii, Department Of Education, et al.*, CIV. NO. 17-00503 DKW-KSC, **ORDER AFFIRMING THE DECEMBER 20, 2017 DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER**